Parker, J.:
The plaintiff in error, a minor, about 18 years of ager suing by his next friend, was plaintiff below, and the defendant in error, an incorporated company, was defendant below. Omitting certain introductory and formal allegations of the petition, it reads as follows:
“At the times hereinafter named, plaintiff was in the employ of defendant and under the supervision of its officers and managers.
‘‘Plaintiff was engaged in the occupation of painting on the bridge known as the up-river bridge, and worked upon scaffolding and supports provided and furnished by defendant.
“That by reason of the neglect and carelessness of defendant,it permitted and allowed to be placed into the construction of said bridge, a certain rod of iron which was wholly defective and unsafe,and not fit for use. That while at work upon said scaffolding, which was suspended in part from this defective rod and without any fault or neglect on plaintiff’s part, and without any knowledge on his part of such defect, said defective iron suddenly broke, thus causing plaintiff to fall a long distance, to-wit, thirty-seven and one-half feet,into the Maumee river, and upon logs floating therein, breaking his right leg above the knee and otherwise greatly injuring him and causing him great loss in time and money, and much pain, etc.,’’ for which he asks judgment in an amount named.
The answer denies negligence, and alleges that the plaintiff’s injuries were received through the fault of a fellow-servant and through plaintiff’s contributory negligence.
These allegations of new matter are denied by a reply.
Upon the plaintiff resting his case, the jury was directed' by the court to return a verdict for defendant, which was done. O-n this verdict judgment was rendered, and on account of this action of the court error is prosecuted here.
It will be observed that the petition contains no averment that the defendant had notice of the defect or knowledge *603 thereof, or ought to have had; nor do we find any averment that may be regarded as a substitute therefor. The general-charge that “by reason of the neglect and carelessness of : defendant it permitted and allowed” the defective rod to be used in the construction of the bridge, is not sufficient. This-charge of negligence is in the nature of a conclusion. Whether the act was negligent, depends partially at least, upon whether the defendant had knowledge or notice of the • defect or by the exercise of reasonable care ought to have - discovered it. Certain rules upon, this subject are laid down in Wood on the Law of Master and Servant, sec. 414, and" .are quoted with approval by Judge Minshall, in his opinion in Coal & Car Co. v. Norman, 39 Ohio St., 598, a part, of which reads as follows:
“The servant, in order to recover for defects in the appliances of the businesses called on to establish three prop- • ositions: 1st. That the appliance was defective, 2nd. That the master had notice thereof, or knowledge, or ought--, to have had. 3d. That the servant did not know of the defect,and had not equal means of knowing with the master.”"
Then Judge Minshall proceeds to say:
“And it is elementary in the law of pleading, that - whatever a party is required to prove in order to make out.. his claim, must be averred,”
The part lacking in this petition, is that required by the. second rule stated above “That the master had notice-thereof, or knowledge, or ought to have had.” No advantage was taken of this defect in the petition by demurrer or-otherwise, and no objection was interposed to the introduction of any evidence upon the trial on the ground that it. tended to prove this element of notice or knowledge as to-which there was no averment; and therefore, we look farther:into the record to see whether there was any evidence tending to prove this as well as the other facts necessary to be:established by the plaintiff to make out his case.
*604 In the consideration of this question, we apply certain rules deduced from the decisions of the Supreme Court of this state, as follows:
That upon a motion to direct a verdict the court is not authorized to weigh the evidence; if there is evidence tending to sustain plaintiff’s case, on all points, no matter how slight, the case must be submitted to the jury; and, for the purpose of the motion,everything is admitted which the evidence in any degree tends to prove,and this involves and includes any and every conclusion which a jury might fairly or reasonably deduce from the evidence,
Now, the evidence in this case discloses that the plaintiff was employed by defendant as one of a gang of painters to paint a certain bridge being erected by defendant over the Maumee river, at Fassett street, Toledo, Ohio. The con.struction of the bridge had been completed about forty-five days before the plaintiff and the other painters with whom he was working had been put to work. In the meantime another gang of painters had covered the bridge with one coat of paint, working upon a swinging scaffold of the same .kind, and fastened to the bridge in the same way as that used by the plaintiff and the gang with which he was at work, and the latter were applying the second coat of paint to the bridge. The frame-work of the bridge was of iron and steel, and there was used in its construction certain steel rods from seven-eighths of an inch to one and one-eighth inches in diameter, and perhaps twenty-five or thirty feet long, which extended across the bridge from side to side obliquely under “T” or “I” beams, upon which the plank floor rested, and these rods passed through and were fastened to certain floor-beams upon which the “I” beams rested, the principal use of such rods being to strengthen the bridge for the resistance of lateral strains produced by wind, the currents of the river, and perhaps other causes. These rods were near to the “I” beams of the bridge, *605 within a few inches thereof' — so near that in painting the upper surfaces of the rods where they crossed such beams it was necessary for the painters to hold their brushes horizontally. The staging or swinging scaffold used by the painters consisted of planks extending across the bridge beneath it, and held in position by ropes fastened thereto and to these rods above,and the scaffold was fitted with ropes,pulleys and tackel which admitted of its being raised’ or lowered as occasion should arise in the progress of the work of painting. Two or more of these planks being so fixed in a certain locality, two or more were fastened and swung in the same way at such a distance from the others as would admit of other planks being laid from one to the other, and the latter could be moved along on the frame made by the former to suit the convenience of the painters at their work.
The scaffolding was prepared for the use of several persons, we do not know bow many, but certainly two, if not more, at the same time. While plaintiff was upon this .scaffold in discharge of his duty as an employe of the defendant, one of these rods to which the ropes holding one corner of the scaffold were fastened, suddenly gaveway--broke off---whereby that part of the scaffold on which plaintiff was standing, fell, and he W83 precipitated to the river below, falling upon a raft of logs, breaking his leg and otherwise injuring his person.
Plaintiff was the only person on this part of the scaffold at the time it fell, There seemed to be no unusual strain upon the rod at the time. Its breaking seems to be inexplicable upon any theory other than that of a defect in the rod, for it seems that a sound rod of that size would have sufficient strength to withstand the strain then upon this rod.
It appears that the materials for this scaffold were furnished by the defendant,and that a foreman who had charge of the construction and painting of the bridge directed plaintiff and his fellow workmen-to fasten the scaffold to *606 these rods precisely as they did fasten the same, and it was the duty of this same foreman to see to the removal of defective parts of the bridge and the replacement thereof by parts not defective.
The plaintiff also introduced evidence to the effect that the defendant had in its employ during the construction and erection of this bridge, one V. A. Haas, whose duty it was to inspect the rods and other parts of this bridge, and who did inspect this rod, and that the plaintiff was not under the orders or .control of said Haas.
Robert H. Finch, an employe of defendant, testifies to-the inspection having been made by Haas, and also to inspections of the rod by a person in the employ of the company who furnished the unfinished rod to the defendant,, and also to an inspection made by a person in the employ of the city; but as this witness does not appear to have had personal knowledge of any of these inspections, we base no conclusions upon his testimony with respect thereto. However, his testimony to the effect that Haas was employed to make the inspection, and that he was a competent inspector, must receive consideration.
More definite testimony as to the employment, qualifications and duties of Haas and of an actual inspection made by him, is given by James A. Huston, the president of the defendant company. In the course of the trial it was agreed that if James A. Huston was personally present he would testify to certain things, and those things were reduced to-writing and introduced in evidence by the plaintiff as the-testimony of Huston, as follows:
“I am president of The Toledo Bridge Company. The-Toledo Bridge Company has always had an inspector. His name is V. A. Haas. It was his business and duty to inspect all workmanship and material going info the Fassett street bridge. He had oeen inspector for us ever since the company was organized, and was the inspector for the *607 Smith Bridge Company before that time. He was a competent, careful inspector: He inspected the rod which broke.. It was his duty to inspect it. The way the scaffolding was upon which Stewart, was painting when he fell was the usual way to paint bridges from,. The rod which broke had been painted once since it had been in position in the bridge, and Stewart was giving it its second coat when it broke. Henry Stewart was not under the orders and control of said V. A. Haas, but was under the control and orders of Ben Hamlin, his foreman.”
Now, the particular questions presented and debated here are whether there was any testimony tending to show that the defendant had actual notice or knowledge of this alleged defect in the rod, or was chargeable with notice thereof, and whether it discharged its whole duty by employing a competent person to inspect the material used in the construction of the bridge?
We will first discuss the question as to the effect of employing an inspector.
It is argued on behalf of defendant that it has done all that the law requires of it in the premises to avoid responsibility for defects, by employing a competent inspector and instructing him to inspect the material and see to it that only proper materials were used in the construction of the bridge; and that such inspector was a fellow servant of the plaintiff, so that if he neglected or failed in his duty, and by his fault this defective rod was placed or allowed to remain in this bridge, because of the weil-settled rules as to injuries resulting from the fault of fellow servants, the plain tiff has no remedy against the defendant. In support of this claim we are cited to L. S. & M. S. Ry. Co. v. Lamphere, 9 C. C., 263, 266; C. & Z. R. Co. v. Webb, 12 Ohio St., 475; R. R. Co. v. Fitzpatrick, 42 Ohio St., 318.
It follows from these cases that where the inspector and the person injured are fellow servants, and the inspection is as to a use, by such injured person, of the article inspected, *608 he cannot recover from the common master even if the inspector shall fail to faithfully or properly perform his duty whereby the injury results. But it does not follow from these decisions that one who is employed to inspect rods going into the construction of a bridge to determine whether they are suitable for the use for which they are designed, is the fellow servant of the one who is called upon long after to work upon such bridge, and is directed in the performance of such work to use such rods in a way not contemplated or designed in the construction of such bridge, or taken into account by such inspector in the inspection thereof. An inspector whose duty it was to determine whether this rod was fit to withstand the strain put upon it by lateral motion of the bridge, caused by wind, or water, or other things, might not be called upon to say whether it would stand the strain of such a weight put upon it as that of the scaffolding and these men. It is apparent that the strains are entirely different in character, and they may be as widely different in degree. The inspector might very properly decide that the rod was fit and proper for the strengthening of the bridge as designed, and yet,if the question was put to him., he might say that it was wholly unsafe as a support of the weight of this scaffolding and these men. If, then, the decision of this latter question was not submitted to him, and was not made any part of his duty, how can it be said that his employment should affect in any way the right of the plaintiff or the responsibility of the defendant, when the rod is devoted to this different use?
.It does not appear that.the inspector was called upon to inspect or test the rod with respect to this use. Neither .does it appear that the rod was unfit for its use as a part of the support of the bridge. So far as we are informed it might have been fit for the latter use and unfit for the former,
Another element that may affect this question of inspec *609 tion is that of time. When the inspection of this rod was ■ made does not distinctly appear, but it is fairly inferablefrom the evidence that it was made while the bridge was. in the process of erection, probably before the rod was used, in the bridge.
Now, can it be said that such an inspection, with no duty • to renew it, would exonerate the master from all liability to-those employed to work upon the bridge, even though they use it as contemplated by the inspection, if such use-occurs months or years after its erection and after the inspection thus made? We do not think the authorities-warrant such a conclusion. Indeed, there is much authority that sustains a rule which seems to us to be reasonable and just, but which cannot be easily reconciled with the rule laid down in the Ohio cases cited,and therefore we do not feel1 inclined to extend the latter rule or apply it to cases not falling clearly within it. This rule is to the effect that the-duty of furnishing safe appliances and machinery cannot be-delegated by the master so as to shift from him or relieve-him of his responsibility to bis servant in the premises — that the inspector or other person to whom such duty is dele- ■ gated becomes the agent of the master,and his negligence or fault is the negligence or fault of the master. The rule is stated in various ways in the authorities; for instance, in 7" Am. & Eng. Ency. of Law, at p. 830:
“It is the duty of a master, not only in the first instance, to make reasonable efforts to supply his employes with safe- and suitable machinery, tools,etc., but also thereafter to make ■ like efforts to keep such machinery, etc., in safe and serviceable condition; and to that end he must make all needful inspections and examinations.”
In a note it is said: “A person performing this duty is not a fellow servant.” In support of that proposition there-are a great many authorities cited.
“In Fuller v. Jewett, 80 N. Y., 46; s. c. 1 Am. & Eng. *610 R.R., Cas. 109, the point raised was,whether the machinists of a railroad company, who are employed to manufacture and repair its engines, are properly to be considered co-employes of engineers employed to run those engines. The decision was that they were not.”
“One charged with keeping machinery in safe condition •is not a fellow servant with him who operates it,in the sense which would relieve a corporation from liability when the latter is-injured by the negligent performance of his duties by the former. Houston, etc., Ry. Co. v. Marcelles, 59 Tex., 384.”
“If no one is appointed by a railway company to look after the condition of its cars and see that the machinery and appliances used to move and. stop them are kept in repair and in good working order, it is liable for the injuries caused thereby. If one is appointed by it charged with that duty, and the injuries result from- bis negligence in its performance, the company is liable. He is, so far as that duty is concerned, the representative of the company. North’n. Pac. Ry. Co. v. Herbert, 116 U. S., 642.”
Again, on page 834, Encycl. of Am, & Eng. Law, under the head of “Criterion of Fellow Servants:”
“The true rule for determining who are fellow servants is to be determined, not from the grade or rank of the offending or injured servant,but it is to be determined by the character of the act being performed by the offending ser'vant. If it is an act that the law implies a contract duty -upon the part of the employer to perform, then the offending employe is not a servant, but an agent; but as to all other acts they are fellow-servants.”
In support of this proposition a great many authorities are cited and certain illustrations given in the notes. As pertinent to certain of these remarks upon what may be deemed fair qualifications of the rule adopted in Ohio, I call attention to the case of Arkerson v. George W. Dennison, in vol. 117, Mass., 407, the syllabus of which -case .reads as follows:
“In an action by a workman against his employer, for *611 personal injuries caused by the fall of a staging upon which the plaintiff was at work repairing a building, the evidence tended to show that the plaintiff went onto the staging by the defendant’s direction; that the staging was insecure in consequence of being constructed of unsuitable materials, or by neglect to fasten it together sufficiently; that the staging was built before the plaintiff began work, by persons who were afterwards his fellow workmen; and that the defendant directed what lumber was to be used therefor. It was not contended that the staging was built under the direct personal supervision of the defendant, but there was evidence that he superintended the work generally. Held, that the jury would be warranted in finding a verdict for the plaintiff. ”
After discussing certain general principles applicable to cases of this character, Wells, J,, in the course of his opinion, at page 412, says:
“The negligence of fellow workmen, for which the master is held to be exempt from responsibility, is negligence in respect to that which the workmen undertook or were set to do. When the preparation oí the appliances is neither entrusted to nor assumed by them, the master may be held guilty of negligence, if defective appliances are furnished, even though the workmen themselves are employed in the preparation of them. ' In such case, negligence appearing, it is a question of fact for the jury whether that negligence was in respect of what was done or undertaken by the fellow workmen, or was the negligence of the mastor. ”
Coming now to the question whether there is any evidence tending to show that the defendant hadi notice of this defect in the rod — (for that there was a defect we assume as we feel bound to in the consideration of this case, since there was testimony tending to show it),or showing that it ought to have known of it, and therefore is chargeable the same as if it actually knew, how does the case stand?
It must be remembered that negligence, or knowledge as *612 an element of negligence, may not be inferred from the mere fact that there was a defect and an accident consequent upon it. The plaintiff is bound to make out his case affirmatively by evidence. There is no evidence tending to show that any responsible agent or officer of the company whose knowledge would be its knowledge, knew of this defect in the rod.
The master is not an -insurer of the perfection of the machinery and appliances furnished to servants to be used in their work. He is not responsible for hidden defects of which he had no knowledge, unless by the exercise of reasonable care such defects would have become known to him. In providing suitable and safe machinery and appliances, he is bound to the exercise of reasonable care only. And the servant assumes all risk of latent defects of which the master was ignorant, unless the master was negligent in not discovering the same. The only direct evidence submitted as to the appearance of the alleged defect has reference to the appearance of the ends of the iron at the point of fracture after the break occurred. Giving to this the most favorable construction for the plaintiff it will bear, it tends to show no more than that there was an old crack or partial fracture in the upper surface and part of the rod at the point where it gave way, extending into the rod from one-fourth of an inch to one-half of the diameter of the rod. Witnesses say that this was indicated by the surfaces of that part of the fracture being darker than the remainder of the surfaces at the place of fracture. While the testimony upon this point is uncertain and conflicting, we give to if, as before remarked and as the rule requires, the construction most favorable to the plaintiff.
But this is not enough. Has it been made to appear •affirmatively, or isltbere any evidence tending to prove that the defect, if it existed, was obvious, or might have been 'discovered by^the master by reasonable care? For, while *613 the question whether the defect was discoverable by the exercise of such care is for the jury, the court is not bound to submit the question to the jury unless the evidence tends to show that it was so. We are of the opinion that the evidence not only falls short of showing or tending to show this affirmatively, but that, on the contrary, it tends to prove, and that very clearly, that the defect, if it existed, was of that latent and secret character that must have eluded the most careful and searching examination and scrutiny. I call attention to the evidence on this point, since there is but little of it.
Louis Highland, (pp. 27-8, Record), testifies:
“Q. Is is not a fact that if you were painting an iron rod, any break that was at all black might be discoverable so as to be seen at once? A. That would be according to whether there was any paint marks in there or not; the break might have been so closed that the paint, would not run in,
“Q. If the break was large enough to be seen, the paint would run in, wouldn’t it? A. Yes,if it could be seen.”
Here is a witness for plaintiff who testified to the dark appearance of the break or fracture, indicating to him that there was an old crack or fracture. It appears further on, in the testimony of this witness, that if there was in fact any fracture there, it was so close that no paint ran into it when the first coat of paint was applied to this rod by the gaqg of painters; yet, he says the fracture could not have been seen if not large or open enough to admit the paint.
James Daley, at age 54, testifies as follows:
“Q. When you had your planks on those^rods, where would your head be? A. Up near the floor. 5
“Q. Above the lateral? A. It would be above the lateral rod.
“Q. Any break or crack on top of the rod,could be seen? A. Yes.
It appears,as'I have stated, that there was no paint in this *614 old crack dr fracture,and that another gang of painters had gone ahead of this gang in their painting, and that the plaintiff and the persons belonging to his gang or crew had fastened their scaffolding to this rod, and there is an entire absence of evidence tending to show that any of these workmen had discovered in their work in painting about this rod any defect in it, though working with it and making their fastenings upon it at almost the precise point where the fracture occurred.
Robert Finch, testifying at pages 30 to 35, declares that there was nothing about the ends of this rod at the point where it broke to indicate that there had been an old fracture or breakage, tie says that he made a careful examination, of this rod after it was broken, and that, from appearances, the rod at that particular point, for some reason, had become crystalized and brittle. Then he is asked the question direct, whether the defect, if it existed, was one which could be discovered or was discoverable, and he declares that it could not have been discovered; that it was of that latent and secret character that it could not have been discovered while in place, though it might have been discovered by taking the rod out and making a test by bending it, or perhaps by some other process, It is also shown by the testimony of this witness — though it would be obvious without testimony — that the weight of the rod would bring close together the surface of any crack in the upper part of the rod.
Another significant fact is this, that another gang of painters had used this rod in the same way, without, mishap, shortly before the plaintiff used it, and that use amounted in our opinion to a practical test of the strength of the rod for the very purpose for which plaintiff was directed to use it, which would warrant the defendant in directing the plaintiff to so use it, and this fact,together with the fact that the defect,whether consisting of crystalizatio» or a partial fracture, was not obvious, we think sufficient ta *615 establish affirmatively''(though this is not required to sustain the judgment), that the defendant had not been guilty of such a want of due care as would justify the imputation of knowledge of the defect, or as would justify the imposition upon it of the burden of the consequence of such knowledge; and while inspection or the employment of an inspector may not of itself amount to a justification in a case of this kind,it is entitled to weight and consideration upon the question of the exercise of due care uponjgthe part of the company.
Dodge & Canary, and M. B. Lemmon, Attorneys for Plaintiff in Error.
Bathbun Fuller, Attorney for Defendant in Error.
- This seems to us to be one of that jclass of unfortunate .accidents the risk of which the plaintiff assumed when he accepted the employment, an accident resulting from a secret defect in the appliances, and occurring under circumstances which involved no wrong or fault on the part of the defendant, and therefore no legal responsiblity upon its part.
' The judgment of the court below will be affirmed.